and her official capacity as Secretary of the U.S. Department of Health and Human Services et al. appellate. Mr. Tenney for the appellate, Mr. Sorensen for the appellate. May it please the Court, the regulation at issue here prevents fixed indemnity products from being sold as an alternative to major medical coverage without providing protection against high out-of-pocket medical costs, which Congress required that all major medical plans provide. As the rulemaking record reveals, many consumers don't realize if they were to have products like this, they don't realize the inadequacy of their coverage until they become sick and then they're unable to pay their high medical expenses because their fixed indemnity plan or other inadequate coverage doesn't provide that sort of protection. Is there any empirical data on that? I'm sorry, empirical data on... People being confused about this? I mean, there weren't data in the form of statistics in the record. There were a number of consumer groups that submitted comments that said that this was a problem. And they didn't have any data either? I don't believe there was data submitted in the record. Neither was there data submitted, you know, the other way. The rulemaking record that the agency was relying on relied on basically comments from several different groups. One was from groups like the American Heart Association, Consumers Union, these are cited in our briefing, that discussed the problems that consumers have when they don't have adequate coverage and the possibility of confusion. And then the second set of materials that was in the administrative records was from, upon which the agency relied, came from the insurance industry, which discussed how fixed indemnity products were typically sold as a supplemental product. The American Insurance Association, for example, said that all of its members sold the product as a supplemental product. And so the agency, based on the record that it had before it, concluded that it was appropriate to ensure, and this is also consistent with the statutory scheme, that the fixed indemnity products just don't amount to an adequate alternative for major medical coverage. And it's clear from plaintiff submissions in this case, although plaintiffs didn't participate in the rulemaking. Well, it may not be the same as the minimum insurance requirements, but it is, it may be good for people who aren't obligated to obtain minimum essential coverage. And why, what interest does the government have in telling those people you can't have this fixed indemnity product until you get the minimum essential coverage that you're not obligated to get? This isn't a question of obligating people to get minimum essential coverage. This is a question about what... Well, you can't buy this other product unless you also have that. No, I understand that, but your question related to the government's interest. And Congress has regulated the insurance products that can be sold and has a detailed scheme that says if you're selling major medical coverage, it has to have certain characteristics, including cost sharing limits and other things that we've discussed in our briefing. And so the question before the agency is whether Congress would have, whether it's necessary and appropriate in carrying out those provisions to allow an entity, such as the plaintiffs in this case, to sell a product, to market it or to sell it to people and say, this can be your only coverage against major medical expenses, which is really what they're saying this should be, but that it doesn't have to satisfy any of those requirements. And Congress has made clear that if you're selling something as medical insurance, as medical coverage, that it's supposed to have these characteristics. So it's really a consumer protection measure. It's not a mechanism to require people to purchase insurance if they don't want to purchase insurance that is either addressed by different provisions of the statute or not at all. It's a question of what products can be sold. Do you have this same rule for the, because this is the individual insurance market, do you apply this same rule for the group health insurance market? No, this rule applies only to the individual market. Why wouldn't you have that same problem for the group market then? Would you not have the same concerns or is it, you know, people, my understanding was people may also want this to cover lost wages while they are sick or to cover deductibles or other expenses they're having to lay out even with an insurance plan. And I assume that's why it gets marketed to group health insurance as well as individual. I just don't understand why it would be different. I mean, just the group, it's really a function of the, the practical answer to your question is that the, the, the regulation for the group market and the regulations for the individual market are done differently. There are different agencies involved in the rule here was an HHS rule that just applied only to the individual market and the agency didn't in this rule making take up whether this should also be done for the group market. But it answered the question of why people would want the coverage. That's exactly right. And that's why the understanding is that people do want this for lost wages. They do want this for deductibles and other things. And that's why it is available and sold. And as the American Insurance Association pointed out and Aflac as well, which is a major provider, it's sold as supplemental coverage. And so people can buy it and they can buy it in the individual or group market. And it supplements their insurance. But the way, and if you look at the brochures that are in the record here, which weren't in the administrative record but give you an indication of the argument, the plaintiffs are making the, it's clear that they're, what they're doing is they're saying, this is going to help you pay for your healthcare. They say that explicitly on page 126 of the joint appendix in their So this is an effort not to sell it in the manner that your honor described to allow people to replace lost wages, to pay deductibles, to have other expenses. You know, there were comments in the rulemaking record suggesting that it could be used for transportation. It could be used for childcare if you have to go to the doctor. And that would all make sense as supplemental insurance. But if this is the only way you're going to pay, if you are getting sick, it just isn't suitable for them to make that choice. Well, I mean, Congress made a determination when it, when it enacted a broad series of regulatory provisions about what insurance products needed to have. If you say that Congress made a determination, but Congress enacted the public health service act, correct? That's right. Right. And that gives two requirements for when you can sell this product. And if the seller has met those two requirements, then how can the agency impose a third requirement? Well, I mean, that's not even the argument the plaintiffs are making here because they're not challenging the disclosure requirement that was that was required by this, the very regulation that's at issue here. The point is, if you look at what Congress was doing and had a category of accepted benefits, and those are all things that would be either supplemental to, or just entirely separate from regular health insurance, liability insurance, dental plans, vision plans, those sorts of things, and fixed indemnity insurance and, and the rulemaking record and that I discussed earlier and, and, and just the nature of the plan suggests that it was thought of as in the same category. This is something you would get as a supplement. And of course, Congress wouldn't require or wouldn't expect that if you're buying a supplement to your health insurance plan, that it has to have all of the characteristics that are required of major medical insurance. And if you look at the actual requirements, what they talk about is the relationship between the fixed indemnity product and your health insurance. They talk about that it can't be So as the agency pointed out in the rulemaking, Congress was presuming that people had other coverage and that this was just a product that was going to be sold as a supplement. And so the question is whether it was necessary and appropriate in carrying out all of these provisions, both making sure that fixed indemnity was playing the function that Congress contemplated for it, and also making sure that the, the, that the requirements for insurance were being met. And we submit that that, that that was well within the agency's discretion here. Is your, because I thought your argument below was that this was interpretive as to either independent non-coordinated or what it means to be fixed indemnity. And in particular, as I read the federal register, the expansion of fixed, the definition of fixed indemnity insurance to include per service products rather than per term products. And it seemed to me, at least in the federal register, that it was that new additional interpretation of what constitutes fixed indemnity insurance, extending it out to per service products. That was why you felt you needed this limitation on who could buy it and you needed the notice provision. Those two came together. But now here, it sounds like you're not making that interpretive argument. You're just making this interstitial argument. I mean, we're emphasizing the interstitial argument. We are still relying on, as I just discussed a moment ago, the language of the statute, both in terms of the non-coordinated provision that I discussed and in terms of just the overall statutory structure of accepted benefits. In response to you. So are you making both arguments? Because the argument before is you were making a response to Judge Brown's question sounded to me like an interstitial one, that there's this gap that's been Congress implicitly assumed this thing was here. A gap has been created. We are filling it in, as opposed to this is part and parcel of our new definition of fixed indemnity insurance to include per service products. We are relying here, as we did in the district court, on the grant of regulatory authority to make regulations that are necessary and appropriate to carry out the statute. I'm not sure that there is a strict dichotomy between interpretive and interstitial, and that was discussed to some degree by the Supreme Court in the Long Island Care at Home case. But I think that it's fair to say that our submission here is that this is within the agency's regulatory authority under that provision. In answer to your question about the definition of fixed indemnity in terms of per service and per period, it's true that if you understand fixed indemnity products to include, as that regulatory definition currently exists, then the need to prevent them being sold as primary insurance goes up. Now, obviously, that distinction or that particular regulatory change hasn't been challenged here. That's motivated in some part. The need to expand it both reflects the agency thought, what was actually in the market, and what state regulators thought the insurance was appropriately used for, and also reflects a difficulty if you're going to say it just has to be per period, then there actually becomes some difficult line drawing questions. Because if you say, all right, it's going to be $100 if you go to the hospital and $50 if you go to the doctor, is that per period? And so the agency concluded that, no, you could actually split it up in a per service way. And it's true that the more you break it out, the more critical it becomes that it not turn into a mechanism to provide something that is sold as major medical insurance, but without any of the protections that Congress deemed appropriate for such coverage. All right. Thank you. Thank you. Thank you, Your Honor. Quinn Sorensen for the appellees. There is nothing in the statute, there is nothing in the record that lends any support to the fixed indemnity rule, to the prohibition against the sale of fixed indemnity plans that are allowed under the And I will start off where counsel for the government started out, even though it is kind of a tertiary issue, and that is the value of these policies. Judge Ginsburg, Judge Millett, I believe you both mentioned, Judge Millett especially, that these are valuable policies to a number of individuals, particularly those who cannot afford minimum essential coverage under the Affordable Care Act and are not eligible for subsidies, the so-called Medicaid gap, as it's been referred to. These individuals and others who have a philosophical objection to purchasing minimum essential coverage are not required to do so, and this may serve as an alternative. And the benefits of these programs have been recognized not only in the comments that were submitted during the rulemaking process by states, by the National Association of Insurance Commissioners, they've also been recognized in the amicus brief that was submitted in this case by states, again, who represent entire populations. It was more importantly recognized by Congress. Congress established a particular exemption for fixed indemnity plans within the context of the Public Health Services Act, and they qualified those as accepted benefits for the very reason that they do provide exceptional value for certain individuals. Well, am I right that there was, prior to this amendment, there had been debate about whether fixed indemnity plans included per service or were just per, I guess, term, only included per term plans consistent with an IRS statute? Am I right? Yes, there was some debate. The debate did not actually extend prior to this case, and this rulemaking, I should say, into the individual sphere. The first time this really arose was in an FAQ in 2013, in which, for the first time to our knowledge, HHS instructed that, in its view, these policies only may cover per duration service. But that was in the But then there's something that's at least some ambiguity about what fixed indemnity rule meant. And then my understanding is that, as a package deal here, they said, fine, we've looked at this whole issue, and fine, and we will consider fixed indemnity to include per service. We hear you on that, but once you start selling things, you know, here's for your prescription, here's for the procedure the doctor performed, then it starts looking an awful lot more like insurance, and people will be confused. And so, you know, the two come together for them, and then this confusion problem arises. I don't believe so, Your Honor. We would argue that there is no dis—I mean, the fixed indemnity policy was defined, actually, in the proposed regulation of HHS in this particular case as a service that provides—as a plan that provides a set amount of cash, money, whatever compensation for a particular procedure. It wasn't per service or per duration. Well, they were explicit in the Federal Register that there was this debate out there, and they were extending it to it. They certainly said that this is what they were going to do, but that was the first time it had been raised. And this is—the point is actually kind of a moot one, because whether it's per service or per duration, that does not answer the fundamental question here, which is, however you interpret fixed indemnity plan, the requirement they have imposed here is not an interpretation of fixed indemnity plan. Rather, it is a restriction, a new condition on the definition of accepted benefit under the statute, under the Public Health Service Administration Act. Is the notice requirement a new condition as well? I'm sorry? Is the notice requirement also a forbidden condition? It could certainly be viewed that way. It has been— Well, is it, or is it—what is your position? No, I would say that it is, to be quite honest. Okay, so that has to go, too. It's not been challenged, is it? It has not. And the reason it has not been challenged is not a concession on our part. It was simply that we already provided this information in the brochures. We had no reason to challenge this notice, because we already instructed— And so do the states require something comparable? They do not. We did this on our own volition. Certain states did. Not all did. But our brochures did so. And in fact, the agents, as the declarations show, just provided this information, because we didn't want to have any lack of clarity in our interactions with consumers. We didn't want them to have confusion over whether the policy they were purchasing was major medical or a fixed indemnity policy. We told them up front, this is not major medical. This is a different type of policy. And that is why we did it, and that's why we didn't challenge the notice provision. It was not by virtue of— If there had been—if they actually had a substantial record of enormous confusion and harm to consumers, if they came—imagine an agency comes forward with a massive record like that. Is there anything they could do, given the statutory provision? Or is it your position that no, they could not even demand notice? I think that's a separate question. I know it's a separate question. I'm willing to concede on the margins. There may be some allowance in that circumstance for a notice requirement or to impose certain restrictions. But that would have to be premised on the basis of the statute. And that is the question. And that's what I'm trying to ask. Is this just as plain statutory language that no matter what the record of harm the agency comes forward with, the statute says what the conditions are, and that's what the conditions are, and if you've got a problem, take it to Congress? Or is your position that, look, since there's ambiguity and room around the edges here, the record here does not support the existence of a problem? And so without evidence of a real problem, the agency doesn't have the authority to add to the list of conditions. They would have to take two steps. One, there is not evidence, but if there was, they would have to identify a particular statutory provision that is either ambiguous or grants them the authority to adopt this particular requirement. And your position would be that there's nothing ambiguous about this provision that would allow that? Well, they haven't even identified a provision that they argue is ambiguous. If you go back to the Federal Register, both the proposed regulation and the final rule, they do not Do you think there's anything here that would allow, anything ambiguous enough to allow it on that record? Do you think there's anything ambiguous in the language that would allow the addition of a notice requirement to stop confusion if they had the record of confusion? I think if you wanted to make an argument regarding independent and non-coordinated, perhaps you could make an argument that in order to establish independent and non-coordinated to be offered by, and again, that is an offered by requirement under the statute, then you could possibly say that in terms of proving that it's offered by, non-coordinated, independent of other coverage, you have to provide notice to the individual who is purchasing. The insurer has to say, this is not major medical. It's not coordinated with that. This is independent from that. That is something you might be able to get. But again, that is not what occurred in this case. And this is getting down to the comment that Judge Brown indicated, the question you had, which is there are two requirements here. The statute is crystal clear. If you have a fixed indemnity policy, then if that qualifies as an accepted benefit, if two conditions are met, one, it is offered as an independent, non-coordinated benefit. Two, it is sold under a separate certificate or policy of insurance. Those are the only two conditions that are set forth in the statute. The statute does not say anything about minimum essential coverage for purchasing it, and it does not in any way vest the agency with authority to adopt additional regulations, much less anything with respect to minimum essential coverage. And that really should be the start and the end of the analysis in this case, because the very essence, the prerequisite of any administrative rulemaking is a delegation of authority by Congress in a specific statutory provision, in specific statutory language that can be identified in the agency rulemaking. Nothing in the rulemaking, nothing in the briefs in this case, nothing in the argument today identifies a specific provision, specific language of the statute that this requires. Why isn't this like Long Island Home and Care, where you had a list, and the agency said, yes, but there's a problem that's now developed, given the evolution of the home service care industry, and we need to add a third condition, and that is that you not be implied by a third party. How is that different? And that is not exactly what happened, Your Honor, if I may disagree a little bit with how you characterized it. What happened in Long Island, and in fact what happened in Home Care Association, which is the subsequent D.C. Circuit case, is that you had ambiguous language in the statute. That is, the scope of the exemption that applied to those individuals employed in domestic service employment. The Supreme Court found, and this Court held thereafter, that that language was not clear as to whom it applied, whether it applied not only to individuals who were employed by the homeowners themselves, but also by third party agencies. And given that ambiguity, it was a classic Chevron situation, in which you had an agency looking at ambiguous language, and they were able to take their expertise and apply it within the boundaries set by the delegation of congressional authority, and decide how it should apply. And that could be based, and that could differ, based on how the agency viewed the problem that's developing. That is not what you have in this case. You have, in fact, the precise opposite. There is no ambiguous language that has been cited in the Public Health Services Act, or in the Affordable Care Act, that would give HHS authority, any delegated authority, to make a regulation of this sort. So whatever problem they see developing, and again, they have no evidence of consumer confusion or anything of that nature, but even if they did, the statute is clear. There are two conditions. If those two conditions are met, not only does the statute not give authority to HHS, if I may continue, not give authority to HHS to promulgate a regulation of this sort. In fact, if you look at 42 U.S.C. 300 GG, 21 C2, as well as 63 B, both of those are the accepted benefits analyses. They incorporate the provision of referring to fixed indemnity policies, and they say if those two conditions are met, the statute shall not apply. In other words, Congress has declared, when those two conditions are met for a fixed indemnity policy, there shall be no federal regulation. There cannot be a clearer expression of congressional intent that these policies shall be allowed to continue without regulation, without a requirement of minimum essential coverage, which, by the way, didn't even exist when these particular provisions were enacted. And there is no way to find that there is any basis for it, even if there was some premise in the administrative record for that. And if I may, just close with one final comment. To the extent, and all you've heard previewed by counsel to the government, is arguments regarding legislative purpose, the catch-all provision, the agency rulemaking, the general rulemaking clause. Those clauses and purpose arguments have been rejected in case after case, including the ones we cite on page 21 of our brief, as insufficient to justify a regulation. You have to have a specific provision that has not been cited here. It wasn't mentioned in the agency rulemaking. Even if it was, you couldn't defer on that basis because it does not support the regulation in this case. Thank you. I know Mr. Timming had no time left. You'd have one minute if you need it. Thank you, Your Honor. Council alluded to the fact that consumers might want this particular type of coverage. It's noteworthy that no consumer in the rulemaking proceeding came forward and said that they wanted this coverage as their only medical coverage, and no consumer has participated in this lawsuit and said that. And as we pointed out in our brief, and HHS pointed out in the rulemaking, consumers who can't afford more comprehensive plans can get what's known as catastrophic coverage, which would include free preventive care and a high deductible plan that would cover other types of expenses. And that's the type of major medical coverage that Congress wanted people who were having trouble affording more expensive plans to get. In terms of a need to tether it to the statutory language, as Council recognized, the statute does talk about independent and non-coordinated. Council seemed to acknowledge that that might, in his view, be an opportunity for the agency to make sure that this is really being offered as an independent and non-coordinated benefit. He said that would be enough for a warning, but obviously that's what's going on here. Why didn't a notice be sufficient? Why didn't the agency have an obligation to try the notice first? Well, there were comments in the rulemaking, and the agency relied on them, about low levels of health literacy. FamilyUSA submitted a comment that if people don't have experience with healthcare costs, it would be difficult for people to follow and understand exactly what was going to happen if they had major medical expenses. Some people are now supposed to make some sort of attestation about their minimal essential coverage. That seems to me to require more insurance literacy than just to read a notice and say, hey, you may have a tax payment if you don't get insurance, too. No, because the attestation, and obviously the seller of the insurance can make this clear, the attestation is just saying, yes, I have health insurance. They have to make the same attestation on their tax forms. This isn't a question of people parsing the notice, figuring out exactly what they are and aren't getting, and understanding how it's going to be affected if they get really sick. This is a question of people making factual statements about what insurance coverage they do or don't have. That's a very different matter. I just have one other quick question. If this particular provision were to be struck down, would the per service versus per term aspect of the regulation also have to go down since they came together as a package in the Federal Register? I mean, the District Court enjoined just the operation of the one provision we've been talking about here today. The question of what the agency would do in response if that injunction were upheld is something the agency would have to determine. Thank you, Your Honor. Thank you. The case will be submitted.
judges: Brown, Millett, Ginsburg